DANIEL M. HAYES (SBN 240250)
HAYES LITIGATION PC
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 295-1545
dh@hayeslitigation.com

Attorney for Plaintiff MidFirst Bank

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIDFIRST BANK, a federally chartered savings association,<br><br>      Plaintiff,<br><br>      v.<br><br>UPGO, INC., a corporation, SUN JOO KIM, an individual, RETRIEVO, INC., a corporation, EDWARD HONG, an individual, TERRAMOR ENTERPRISES INC., a corporation, BYUNG WOO CHOI, an individual, MEDICAL BENEFITS INC., a corporation, KIYONG JEONG, an individual, ZODIAK, INC., a corporation, KRIS PARK, an individual, INSUK WORLDWIDE CORP., a corporation, TAE MYUNG EOM, an individual, DURUSTECH, INC., a corporation, WOO YOUNG JANG, an individual, VITAPRO, INC., a corporation, HYEJIN LEE, an individual, JUNGWOO INC., a corporation, SUN OK YUN, an individual, ZEBRA COMMERCE, INC., a corporation, BYUNGIK DAVID OH, an individual, YEON YI aka YUNA LEE, an individual, and DOES 1-100, inclusive,<br><br>      Defendants. | Case No. 8:23-cv-2170<br><br>Dept.:<br>Judge:<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUD;**<br>**(2) VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1961, ET SEQ.);**<br>**(3) NEGLIGENT MISREPRESENTATION;**<br>**(4) BREACH OF CONTRACT;**<br>**(5) FORECLOSURE OF COLLATERAL;**<br>**(6) TORTIOUS INTERFERENCE WITH CONTRACT; AND**<br>**(7) VIOLATION OF CAL. BUS. & PROF. CODE § 17200**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff MidFirst Bank ("MidFirst") brings this action to address Defendants' fraudulent procurement of over $3 million from its small business lending program. MidFirst alleges:

## THE PARTIES

1. MidFirst is a federally chartered savings association. Its home office and principal place of business is 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118. MidFirst is, for jurisdictional purposes, a citizen of Oklahoma, only. 12 U.S.C. § 1464(x).

2. Defendant Upgo, Inc. ("Upgo") is a corporation organized under the laws of Montana. Its principal place of business is 6131 Orangethorpe Avenue, Suite 450, Buena Park, California 90620. Upgo is, for jurisdictional purposes, a citizen of Montana and California.

3. Defendant Sun Joo Kim ("Kim") is an individual citizen of California, residing at 1341 South Hoover Street, Apartment 4, Los Angeles, California 90006. MidFirst is informed and believes that Kim is the current owner of Upgo.

4. Defendant Retrievo, Inc. ("Retrievo") is a corporation organized under the laws of Montana. Its principal place of business is 7342 Orangethorpe Avenue, #A-210, Buena Park, California 90621. Retrievo is, for jurisdictional purposes, a citizen of Montana and California.

5. Defendant Edward Hong ("Hong") is an individual citizen of California, residing at 461 West Roberta Avenue, Fullerton, California 92832. MidFirst is informed and believes that Hong is the current owner of Retrievo.

6. Defendant Terramor Enterprises Inc. ("Terramor") is a corporation organized under the laws of Delaware. Its principal place of business is 901 West Wilshire Avenue, Fullerton, California 92832. Terramor is, for jurisdictional purposes, a citizen of Delaware and California.

7.      Defendant Byung Woo Choi ("Choi") is an individual citizen of California, residing at 957 South Dewey Avenue, #6, Los Angeles, California 90006.  MidFirst is informed and believes that Choi is the current owner of Terramor.

8.      Defendant Medical Benefits Inc. ("Medical Benefits") is a corporation organized under the laws of Delaware.  Its principal place of business is 17315 Studebaker Road, Suite 332-D, Cerritos, California 90703.  Medical Benefits is, for jurisdictional purposes, a citizen of Delaware and California.

9.      Defendant Kiyong Jeong ("Jeong") is an individual citizen of California, residing at 5201 Lincoln Avenue, #231, Cypress, California 90630.  MidFirst is informed and believes that Jeong is the current owner of Medical Benefits.

10.     Defendant Zodiak, Inc. ("Zodiak") is a corporation organized under the laws of Montana.  Its principal place of business is 17534 Studebaker Road, Unit A, Cerritos, California 90703.  Zodiak is, for jurisdictional purposes, a citizen of Montana and California.

11.     Defendant Kris Park ("Park") is an individual citizen of California, residing at 12390 Sandy Court, Whittier, California 90602.  MidFirst is informed and believes that Park is the current owner of Zodiak.

12.     Defendant Insuk Worldwide Corp. ("Insuk") is a corporation organized under the laws of California.  Its principal place of business is 1214 South Main Street, Suite C, Los Angeles, California 90015.  Insuk is, for jurisdictional purposes, a citizen of California.

13.     Defendant Tae Myung Eom ("Eom") is an individual citizen of California, residing at 6032 Kingman Avenue, Unit F, Buena Park, California 90621.  MidFirst is informed and believes that Eom is the current owner of Insuk.

14.     Defendant Durustech, Inc. ("Durustech") is a corporation organized under the laws of Montana.  Its principal place of business is 8201 Orangethorpe Avenue, Suite C, Buena Park, California 90621.  Durustech is, for jurisdictional purposes, a citizen of Montana and California.

15.    Defendant Woo Young Jang ("Jang") is an individual citizen of California, residing at 501 West Saint Andrews Avenue, La Habra, California 90631.  MidFirst is informed and believes that Jang is the current owner of Durustech.

16.    Defendant Vitapro, Inc. ("Vitapro") is a corporation organized under the laws of Montana.  Its principal place of business is 2250 Rosecrans Avenue, Fullerton, California 92833.  Vitapro is, for jurisdictional purposes, a citizen of Montana and California.

17.    Defendant Hyejin Lee ("Lee") is an individual citizen of California, residing at 4420 Avocado Grove Lane, Yorba Linda, California 92886.  MidFirst is informed and believes that Lee is the current owner of Vitapro.

18.    Defendant Jungwoo Inc. ("Jungwoo") is a corporation organized under the laws of California.  Its principal place of business is 2530 West Whittier Boulevard, Unit 8, La Habra, California 90631.  Jungwoo is, for jurisdictional purposes, a citizen of California.

19.    Defendant Sun Ok Yun ("Yun") is an individual citizen of California, residing at 1121 Pinto Drive, La Habra Heights, California 90631.  MidFirst is informed and believes that Yun was the owner of Jungwoo at all relevant times.

20.    Defendant Zebra Commerce, Inc. ("Zebra") is a corporation organized under the laws of Wyoming.  Its principal place of business is 6 Centerpointe Drive, Suite 750, La Palma, California 90623.  Zebra is, for jurisdictional purposes, a citizen of Wyoming and California.

21.    Defendant Byungik David Oh ("Oh") is an individual citizen of California, residing at 1681 West Weiskoff Court, La Habra, California 90631.  MidFirst is informed and believes that Oh was the owner of Zebra at all relevant times.

22.    Hereinafter, Upgo, Retrievo, Terramor, Medical Benefits, Zodiak, Insuk, Durustech, Vitapro, Jungwoo, and Zebra are referred to individually as a "Borrower Defendant" and collectively as the "Borrower Defendants," and Kim, Hong, Choi, Jeong, Park, Eom, Jang, Lee, Yun, and Oh are referred to individually as a "Guarantor Defendant" and collectively as the "Guarantor Defendants."

23.    Defendant Yeon Yi, also known as Yuna Lee ("Yeon Yi"), is an individual citizen of California, residing at 13808 Ashworth St., Cerritos, California 90703.

24.    MidFirst is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and therefore sues said Defendants by such fictitious names.  MidFirst will amend this Complaint to set forth the true names and capacities of said Defendants when they are ascertained.  MidFirst is informed and believes and based thereon alleges that each Defendant designated herein as a DOE is in some manner legally responsible for the acts and omissions alleged herein and by reason thereof has proximately caused the damages and injuries to MidFirst alleged in this Complaint.

25.    MidFirst is informed and believes and based thereon alleges that at all material times, each Defendant named herein, including those fictitiously designated as a DOE, was acting as the agent of each other Defendant, and in doing the acts hereinafter alleged, was acting within the course and scope of said agency, with the knowledge, consent, authorization, and approval of the other Defendants.  To the extent any of the actions of said agents were not expressly authorized, said actions were ratified and approved.

## JURISDICTION

26.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because:

    a.  The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs; and

    b.  Plaintiff is a citizen of Oklahoma, and Defendants are citizens of California, Montana, Wyoming, and/or Delaware, *i.e.*, there is complete diversity of citizenship, in that Plaintiff on the one hand, and Defendants on the other hand, are citizens of different States.

27.    In addition, this Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1965(a) because it asserts a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq.  This Court has supplemental

jurisdiction over the remainder of the claims, which are related state law claims, pursuant to 28 U.S.C. § 1367(a).

28.    Defendants are subject to personal jurisdiction in California because they reside in California and the unlawful conduct alleged herein took place in and caused injury in California.

## VENUE

29.    This District is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b) because each Defendant resides in this District and a substantial part of the events giving rise to this matter occurred in this District.

## DIVISIONAL ASSIGNMENT

30.    The Southern Division is the proper division for this matter pursuant to General Order No. 23-05, I.B.1.a.(1)(c) because more than 50% of the Defendants reside in the Southern Division.

## FACTUAL ALLEGATIONS

### MIDFIRST'S BUSINESS EXPRESS LENDING PROGRAM

31.    MidFirst is a privately owned bank, serving local communities around the country.

32.    MidFirst's Business Express Lending program offers customized loan products for small businesses, including lines of credit to help mitigate the financial stress caused by income fluctuations, unpredictable expenses, and need for capital.  To qualify, borrowers must have annual sales revenue less than $7,500,000 and can finance as little as $10,000 and as much as $1,000,000, with fixed or variable rates and a low fee structure.

33.    Defendants took advantage of the Business Express Lending program's streamlined application process, conspiring to fraudulently procure more than $3,000,000 from MidFirst.

### THE TEN UNIFORMLY FRAUDULENT APPLICATIONS

34.    In October 2021, Yeon Yi began referring Defendants to 1st Century Bank, an unincorporated division of MidFirst that serves the Southern California community.  From

October 2021 to November 2022, the Borrower Defendants applied for and secured substantial business lines of credit from MidFirst pursuant to its Business Express Lending program. In all ten applications, the Borrower Defendants and Guarantor Defendants represented, uniformly, that:

a. The associated Guarantor Defendant had owned and operated the Borrower Defendant since its inception;

b. The Borrower Defendant was the only business entity owned by the associated Guarantor Defendant; and

c. The Borrower Defendant was in the wholesale industry and needed a business line of credit to purchase inventory.

35. Defendants knew these representations were material to MidFirst's underwriting and credit risk assessment. In general, corporate borrowers that are (i) established businesses, with (ii) committed, singularly focused owners, who (iii) need funding to purchase inventory to meet demand, are safe credit bets. In addition, Yeon Yi— the referral source, point-person, and conduit of information for all the other Defendants— learned after the first application (Upgo) that, in evaluating a Business Express Loan application, MidFirst would consider an entity's time in operation and tended to look favorably on businesses in the wholesale industry that held inventory.

36. Defendants' representations were thus knowingly, consistently, and strategically false:

a. None of the Guarantor Defendants had owned and operated their associated Borrower Defendants since inception. In many cases, the Borrower

Defendant is a "shelf company"[1] that the associated Guarantor Defendant acquired shortly before their Business Express application.  Further, many Borrower Defendants did not acquire an Employer Identification Number ("EIN") until several years after incorporation, typically when the foreign entity was registered in California.

b.  All the associated Guarantor Defendants had interests in other business entities[2] at the time of their respective applications; and

c.  None of the Borrower Defendants used their business line of credit to purchase inventory on an as-needed basis.  Upon application approval, all but one of the Borrower Defendants immediately advanced the available loan funds and then transferred them to a different financial institution, and all the Borrower Defendants used their MidFirst accounts to move funds to and from other Defendants and their related entities.[3]

---

[1] "Shelf corporations are legally incorporated but left dormant until they are sold to a purchaser seeking to do business in an existing entity. Shelf companies are attractive as ready to go corporations as any legal filing requirements of formation have already been satisfied, no shares have yet been offered, and ownership to the purchaser is immediately available . . . Shelf corporations may be purchased on the Internet for a few thousand dollars from trust company service providers (TCSPs)." Pacini, Carl, et. al. An Analysis of Money Laundering, Shell Entities, and No Ownership Transparency that Washes Off and On Many Shores: A Building Tidal Wave of Policy Responses, 30 FALL Kan. J.L. & Pub. Pol'y 1, 25 (2020).

[2] The omission of these additional entities is also significant because a review of the Defendant Borrowers' deposit accounts held with MidFirst revealed that numerous undisclosed related entities were the makers and/or payees on a high volume of check transactions, supporting an additional connection among the Borrower Defendants and Guarantor Defendants.

[3] Borrower Defendants also applied for and received MidFirst business credit cards.  The statements revealed many transactions at designer clothing and accessories stores (such as Hugo Boss, Louis Vuitton, Ralph Lauren, Bottega Veneta, Hermes, Chanel, and Prada), restaurants owned by related parties, golf courses, and plastic surgery centers.  Defendants' abuse of their MidFirst credit card privileges is consistent with the fraud alleged herein, but not the subject of this action.

## MIDFIRST DISCOVERS THE FRAUD AND DECLARES DEFAULT

37.    MidFirst discovered this homogenous pattern of misrepresentations and, between May 16 and May 19, 2023, sent a notice to each Defendant, declaring default and its intent to accelerate the Defendants' repayment obligations under their respective promissory notes (the "First Notice").

38.    Only one of the Defendants responded to the First Notice.[4]  Therefore, on June 6, 2023, MidFirst sent another notice to each Defendant, confirming that their repayment obligations had been accelerated and their respective loans were due in full, immediately (the "Second Notice").

39.    None of the Defendants responded to the Second Notice.  On July 26, 2023, MidFirst sent Defendants a third notice, addressing Defendants' continuing failure to cure their defaults and pay back the loan funds in full (the "Third Notice").

40.    Defendants ignored the Third Notice as well.  To date, all Borrower Defendants and Guarantor Defendants are in breach of their respective promissory notes, commercial security agreements, and commercial guaranty agreements.  None of the Borrower Defendants or Guarantor Defendants have paid the balance due on their loans and all Borrower Defendants have stopped the monthly payments they were making prior to acceleration.

## FIRST CLAIM—FRAUD

### (AGAINST ALL DEFENDANTS)

41.    MidFirst incorporates Paragraphs 1 through 40 as though fully set forth herein.

42.    Each Borrower Defendant applied for and secured a business line of credit from MidFirst.  In each application, the Borrower Defendants and Guarantor Defendants

---

[4] On May 22, 2023, Choi called MidFirst to address the hold on his deposit account. MidFirst advised him that his account had been flagged due to a lawsuit filed against him and Terramor (*see* discussion of *The Business Backer, LLC v. Terramor Enterprises, Inc. and Byung Choi*, Case No. 2023-CV-01488, *infra*).  Choi claimed he would attempt to refinance before the compliance deadline in the First Notice, but MidFirst never heard from him again.

made material misrepresentations upon which MidFirst reasonably relied to its detriment, to wit:

### Upgo/Kim

43.    Upgo/Kim applied for a business line of credit for Upgo in September 2021, and made the following knowing and material misrepresentations to MidFirst:

   a.   Kim represented that she had owned and operated Upgo since inception. She had not.  Daniel Jensen ("Jensen")[5] incorporated Upgo in Montana in 2016, and Kim does not appear as an officer until April 2021, more than five years later, and only months before her application.  Upgo was not assigned an EIN until May 3, 2021, despite having provided MidFirst with tax returns for tax years 2018—2020, purportedly filed using the EIN assigned in 2021.

   b.   Kim represented that Upgo was the only business entity that she owned.  It was not.  Kim had interests in several other entities (including, but not limited to, Chura Services, Inc. ("Chura Services") and Crystalline Enterprises, Inc. ("Crystalline Services")), none of which she disclosed to MidFirst.

   c.   Kim represented that she was not a co-borrower or guarantor on any other loan.  She was.  As revealed in lawsuits against Kim and her undisclosed

---

[5] Jensen is an apparent purveyor of "shelf companies," and is also the incorporator, in Montana, for Defendants Durustech, Retrievo, Vitapro, and Zodiak.

other business entities, Kim was a guarantor on loans to Chura Services and Crystalline Enterprises.[6]

    d.  Upgo and Kim represented that Upgo was a wholesaler that needed a line of credit to purchase inventory.  This was false.  Shortly after MidFirst approved its application, Upgo advanced the full amount of available loan funds, $400,000, and then immediately wired $350,000 to an account at a different financial institution.  Upgo proceeded to use its new MidFirst business accounts to transfer funds to and from Kim's other entities (including "Biano Services, Inc.," which Oh was previously an officer of) and to and from the other Defendants (including Medical Benefits, Terramor, Jeong, Zodiak, and Park), and their related businesses (including "Artotech, Inc." (Lee), "Enumero, Inc." (Park), "KD Trading LLC" (Park), "Witness Systems Inc." (Eom), "Woorim Trading Co. (Jeong), "Logitisys, Inc." (Hong), and "Renyu Inc." (Oh)).

    e.  Kim represented that neither she nor her business were involved in pending or ongoing legal actions.  She was.  As noted, Kim and two of her other undisclosed business entities, "Chura Services" and "Crystalline Enterprises," were defendants in a loan-related lawsuit filed by Fox Capital Group, Inc. in Kings County, New York on September 27, 2021, while the loan application was pending.

---

[6] On September 27, 2021, Fox Capital Group, Inc. filed a loan-related lawsuit against Chura Services, Crystalline Enterprises, and Kim in Kings County, New York.  Judgment was entered on November 8, 2021, in the amount of $71,391.38.  On December 27, 2022, Cathay Bank filed a loan-related lawsuit against Chura Services and Kim in Los Angeles Superior Court.  Judgment was entered by default on June 21, 2023 in the amount of $58,623.95.  In addition, on February 22, 2021, DT Los Angeles Inc. filed a fraud lawsuit in Los Angeles Superior Court titled *DT Los Angeles, Inc. v. David Oh, et al.*, LASC Case No. 21STCV06859 (the "DT Los Angeles Lawsuit").  The defendants in the DT Los Angeles Lawsuit include, among others, Oh, one of Oh's other business entities called "Fabien Financial, Inc.," Chura Services, and "Norte Direct LLC," to which Terramor sent approximately $100,000 in loans funds that it secured from MidFirst, as discussed herein.

44. Upgo and Kim knew their representations were false when they made them.

45. Upgo and Kim intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Upgo/Kim application or extended the line of credit.

46. After discovering the fraud, MidFirst sent three written notices to Upgo and Kim demanding, *inter alia*, repayment of the fraudulently procured loan funds. They have not repaid any portion of the outstanding loan funds. Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

47. As a result, MidFirst has been damaged, and Upgo and Kim's misrepresentations were substantial factors in causing that damage.

### RETRIEVO/HONG

48. Retrievo/Hong applied for a business line of credit for Retrievo in March 2022, and made the following misrepresentations to MidFirst:

    a. Hong represented that he had owned and operated Retrievo since inception. He had not. Jensen incorporated Retrievo in Montana in 2016. Hong does not appear as an officer until January 2022, more than five years later. An EIN was not issued for this entity until December 8, 2020, four years after incorporation.

    b. Hong represented that Retrievo was the only business entity that he owned. It was not. Hong had interests in several others (including, but not limited to, "Entender LLC" and "Logitisys, Inc."), none of which he disclosed to MidFirst.

    c. Retrievo and Hong represented that Retrievo was a wholesaler that needed a line of credit to purchase inventory. This was false. Shortly after MidFirst approved its application, Retrievo advanced $380,000 of the $400,000 available loan funds and then immediately wired the entire amount to an account at a different financial institution. After receiving the

remainder of the loan funds in its new MidFirst checking account, Retrievo
used it to transfer funds to and from related business entities (including
"Logistigrow, Inc." and "Logitisys, Inc.").

49.    Retrievo and Hong knew their representations were false when they made
them.

50.    Retrievo and Hong intended that MidFirst rely on the foregoing
misrepresentations, and it did reasonably rely on them in approving the application and
extending the requested line of credit; had MidFirst known the true facts, it would not have
approved the Retrievo/Hong application or extended the line of credit.

51.    After discovering the fraud, MidFirst sent three notices to Retrievo and Hong
demanding, *inter alia*, repayment of the fraudulently procured loan funds.  They have not
repaid any portion of the outstanding loan funds.  Indeed, they have not even responded,
and have ceased making the minimum interest-only monthly payments.

52.    As a result, MidFirst has been damaged, and Retrievo and Hong's
misrepresentations were substantial factors in causing that damage.

### TERRAMOR/CHOI

53.    Terramor/Choi applied for a business line of credit for Terramor in March
2022, and made the following knowing and material misrepresentations to MidFirst:

    a.    Choi represented that he had owned and operated Terramor since inception.
He had not.  Terramor was incorporated in 2005 in Delaware by V. Le, and
Choi does not appear as an officer until September 2021, more than fifteen
years later. Terramor became inoperative in Delaware in March 2013, and
a Certificate of Revival of Charter was filed on November 16, 2020 by Oh,
two months before it was registered in California in January 2021 by an
individual other than Choi.

    b.    An EIN was not issued for this entity until April 27, 2021, yet Terramor
provided tax returns for tax years 2019 and 2020, which were apparently
filed by Choi on behalf of Terramor.

c. Choi represented that Terramor was the only business entity that he owned. It was not. Choi had interests in several others (including, but not limited to, "Proposito LLC" and "Newasiana Supply Inc."), none of which he disclosed to MidFirst.

d. Terramor and Choi represented that Terramor was a wholesaler that needed a line of credit to purchase inventory. This was false. Immediately after it received the full amount of available loan funds, $101,894.86, Terramor wrote $99,223.80 in checks, none of which appear to have been used to purchase inventory. These checks include payments to an entity named "Norte Direct LLC," a defendant alongside Oh in the DT Los Angeles Lawsuit (*see* n.6, *supra*), and Upgo.

e. Choi represented on his personal financial statement that he owned real property in Washington. This was false, as property records revealed he only owned a 50% interest in the property, which he deeded to another individual just days before he submitted his personal financial statement to MidFirst.

54. Terramor and Choi knew their representations were false when they made them.

55. Terramor and Choi intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Terramor/Choi application or extended the line of credit.

56. After discovering the fraud, MidFirst sent three written notices to Terramor and Choi demanding, *inter alia*, repayment of the fraudulently procured loan funds. Choi only responded to the First Notice, claiming he would attempt to refinance before the compliance deadline. MidFirst never heard from him again. Terramor and Choi have not repaid any portion of the outstanding loan funds and have ceased making the minimum interest-only monthly payments.

57.    As a result, MidFirst has been damaged, and Terramor and Choi's misrepresentations were substantial factors in causing that damage.

### MEDICAL BENEFITS/JEONG

58.    Medical Benefits/Jeong applied for a business line of credit for Medical Benefits in April 2022, and made the following knowing and material misrepresentations to MidFirst:

      a.    Jeong represented that he had owned and operated Medical Benefits since inception.  He had not.  Medical Benefits was incorporated in 2003 in Delaware by T. Pham, and Jeong does not appear as an officer until April 2021, more than seventeen years later.  A Certificate of Revival of Charter was filed in Delaware on November 5, 2020, indicating that Medical Benefits was inoperative prior to that time.  An EIN was not issued for this entity until June 28, 2021, yet the tax returns provided by Medical Benefits included a 2020 tax return filed using the EIN, with a filing date of March 3, 2021, prior to the issuance of the EIN.

      b.    Jeong represented that Medical Benefits was the only business entity that he owned.  It was not.  Jeong had interests in several other entities (including, but not limited to, "Consido Network, Inc.," "Consistech, Inc.," "Credibilitech, Inc.," and "Woorim Trading Co."), none of which he disclosed to MidFirst.

      c.    Medical Benefits and Jeong represented that Medical Benefits was a wholesaler that needed a line of credit to purchase inventory.  This was false.  Like Terramor, immediately after Medical Benefits received the full amount of available loan funds, $253,123.86, it wrote $171,705.23 in checks, but not for inventory.  For example, $17,000 went to "Woorim Trading Co.," one of Jeong's undisclosed companies; $9,005.23 went to "Credibilitech, Inc.," another of Jeong's undisclosed companies; and $20,000 went to "Biano Services," Kim's company (which she did not

disclose in her application for Upgo, and which used to be associated with Oh).

59.   Medical Benefits and Jeong knew their representations were false when they made them.

60.   Medical Benefits and Jeong intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Medical Benefits/Jeong application or extended the line of credit.

61.   After discovering the fraud, MidFirst sent three written notices to Medical Benefits and Jeong demanding, *inter alia*, repayment of the fraudulently procured loan funds.  They have not repaid any portion of the outstanding loan funds.  Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

62.   As a result, MidFirst has been damaged, and Medical Benefits and Jeong's misrepresentations were substantial factors in causing that damage.

### ZODIAK/PARK

63.   Zodiak/Park applied for a business line of credit in April 2022, and made the following knowing and material misrepresentations to MidFirst:

    a.   Park represented that she had owned and operated Zodiak since inception. She had not.  Jensen incorporated Zodiak in Montana in 2016, and Park does not appear as an officer until January 2021.  Zodiak was not registered as a foreign corporation in California until February 2021 and was not issued an EIN until March 12, 2021, more than five years after incorporation.

    b.   Park represented that Zodiak was the only business entity that she owned. It was not.  Park had interests in several others (including, but not limited to, "Enumero Inc.," "KD Trading LLC," and "SNK Medspa, Inc."), none of which she disclosed to MidFirst.

c. Zodiak and Park represented that Zodiak was a wholesaler that needed a line of credit to purchase inventory. This was false. Shortly after MidFirst approved its application, Zodiak advanced the full amount of available loan funds, $399,623.86, and then immediately wired $350,000 to an account at a different financial institution. Zodiak proceeded to use its new MidFirst checking account to make Tesla car payments, not purchase inventory.

64. Zodiak and Park knew their representations were false when they made them.

65. Zodiak and Park intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the applications and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Zodiak/Park application or extended the line of credit.

66. After discovering the fraud, MidFirst sent three written notices to Zodiak and Park demanding, *inter alia*, repayment of the fraudulently procured loan funds. They have not repaid any portion of the outstanding loan funds. Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

67. As a result, MidFirst has been damaged, and Zodiak and Park's misrepresentations were substantial factors in causing that damage.

**INSUK/EOM**

68. Insuk/Eom applied for a business line of credit for Insuk in June 2022, and made the following knowing and material misrepresentations to MidFirst:

a. Eom represented that he had owned and operated Insuk since inception. He had not. Insuk was incorporated in 2018 in California by Insook Kim, not Eom. Eom does not appear as an officer until September 2021, approximately three years later.

b. Eom represented that Insuk was the only business entity that he owned. It was not. Eom had interests in several other entities (including, but not limited to, "Moresmas, Inc." and "USA Republic, Inc."), none of which he disclosed to MidFirst.

c. Insuk and Eom represented that Insuk was a wholesaler that needed a line of credit to purchase inventory. This was false. Shortly after MidFirst approved its application, Insuk advanced the full amount of available loan funds, $281,623.86, and then immediately wired $250,000 to an account at a different financial institution. Insuk subsequently attempted to issue a $7,500 check to one of Eom's other undisclosed entities, "Witness Systems, Inc.," but MidFirst blocked the transfer.

69. Insuk and Eom knew their representations were false when they made them.

70. Insuk and Eom intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Insuk/Eom application or extended the line of credit.

71. After discovering the fraud, MidFirst sent three written notices to Insuk and Eom demanding, *inter alia*, repayment of the fraudulently procured loan funds. They have not repaid any portion of the outstanding loan funds. Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

72. As a result, MidFirst has been damaged, and Insuk and Eom's misrepresentations were substantial factors in causing that damage.

**DURUSTECH/JANG**

73. Durustech/Jang applied for a business line of credit for Durustech in August 2022, and made the following knowing and material misrepresentations to MidFirst:

a. Jang represented that he had owned and operated Durustech since inception. He had not. Jensen incorporated Durustech in Montana in 2017, and Jang does not appear as an officer until November 2020. Durustech was not registered as a foreign corporation in California, and was not issued an EIN, until the same month and year, November 2020, three years after incorporation.

b. Jang represented that Durustech was the only business entity that he owned. It was not. Jang had an interest in another entity, "Kamet, Inc," another Montana entity formed in 2016 and not registered in California until several years later, which he did not disclose to MidFirst.

c. Durustech and Jang represented that Durustech was a wholesaler that needed a line of credit to purchase inventory. This was false. Shortly after MidFirst approved its application, Durustech advanced the full amount of available loan funds, $399,623.86, and then immediately wired $300,000 to an account at a different financial institution. Durustech proceeded to send a $50,000 check to "TTADAN," which is associated with Sarah Young Oh, the presumed wife[7] of Oh.

74. Durustech and Jang knew their representations were false when they made them.

75. Durustech and Jang intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Durustech/Jang application or extended the line of credit.

76. After discovering the fraud, MidFirst sent three notices to Durustech and Jang demanding, *inter alia*, repayment of the fraudulently procured loan funds. They have not repaid any portion of the outstanding loan funds. Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

77. As a result, MidFirst has been damaged, and Durustech and Jang's misrepresentations were substantial factors in causing that damage.

---

[7] Oh filed Chapter 7 bankruptcy with Sarah Young Oh, *see* discussion of *In re Byungik David Oh and Sarah Young Oh*, Case No. 2005-31459, *infra*.

### VITAPRO/LEE

78.    Vitapro/Lee applied for a business line of credit for Vitapro in September 2022, and made the following knowing and material misrepresentations to MidFirst:

    a.  Lee represented that she had owned and operated Vitapro since inception. She had not.  Jensen incorporated Vitapro in Montana in 2016, and Lee does not appear as an officer until November 2020.  Vitapro was not registered as a foreign corporation in California until December 2020, more than four years later.

    b.  Lee represented that Vitapro was the only business entity that she owned. It was not.  Lee had an interest in several others (including, but not limited to, "Artotech, Inc." and "Seattle Inc."), none of which she disclosed to MidFirst.

    c.  Vitapro and Lee represented that Vitapro was a wholesaler that needed a line of credit to purchase inventory.  This was false.  Shortly after MidFirst approved its application, Vitapro advanced the full amount available loan funds, $399,623.86, and initiated two wires.  One was for $98,000 to "Artotech, Inc.," one of Lee's undisclosed other entities.  The other was for $42,000 to "Danmi Corp.," which is associated with Diana Sangwon Lee, the presumed daughter of Lee.  Vitapro proceeded to use its new MidFirst checking account to transfer substantial sums to and from other entities associated with Lee and her presumed family members (including "Benigne, Inc.," "Danmi Corp.," "CZ America,"[8] and "Artotech, Inc.;" in total, Vitapro transferred $315,500 to "Artotech, Inc." and $150,500 to "CZ America").

79.    Vitapro and Lee knew their representations were false when they made them.

---

[8] Lee was previously associated with an entity named "Charmzone America."

80.    Vitapro and Lee intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the applications and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Vitapro/Lee application or extended Vitapro the line of credit.

81.    After discovering the fraud, MidFirst sent three notices to Vitapro and Lee demanding, *inter alia*, repayment of the fraudulently procured loan funds.  They have not repaid any portion of the outstanding loan funds.  Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

82.    As a result, MidFirst has been damaged, and Vitapro and Lee's misrepresentations were substantial factors in causing that damage.

### JUNGWOO/YUN

83.    Jungwoo/Yun applied for a business line of credit for Jungwoo in September 2022, and made the following knowing and material misrepresentations to MidFirst:

    a.    Yun represented that she had owned and operated Jungwoo since inception.  She had not.  Philip Jung Kim incorporated Jungwoo in California in 2016.  On February 23, 2022, Jung Su Kim is reported as an officer of Jungwoo.  Yun does not appear as an officer until May 2022, more than six years after incorporation.  Notably, according to the most recent California Secretary of State filing, dated July 6, 2023, Jung Su Kim is again listed as the current officer, replacing Yun.

    b.    Yun represented that Jungwoo was the only business entity that she owned.  It was not.  Yun had interests in several others (including, but not limited to, "Bergamo Funding Inc.," "Conrat Trading Inc.," "JNS Vision Inc.," "Mayqueen Trading," "Mijueun Trading Inc.," "Telucid Inc.," and "Woojuro Inc."), none of which she disclosed to MidFirst.

    c.    Jungwoo and Yun represented that Jungwoo was a wholesaler that needed a line of credit to purchase inventory.  This was false.  After Jungwoo was approved for a line of credit in the amount of $400,000, Jungwoo received

an initial disbursement of loan funds in the amount of $200,000. It wired the entire amount to an account at a different financial institution on the same day. Jungwoo received a second disbursement of $100,000 and a third disbursement of $95,000 which Jungwoo transferred via checks to her other undisclosed entities (including "Mijeun Trading," "Mayqueen Trading," and "Conrat Trading") and to entities associated with Jung Su Kim, a former and apparent current officer of Jungwoo (including "Sabasi Trading" and "Rira Enterprises").

d.  Yun represented that she owned her residence, however, at the time she submitted her personal financial statement to MidFirst, she had transferred the property to "Sebasi Trading" and Sebasi Trading subsequently transferred it to Jung Su Kim.

84.  Jungwoo and Yun knew their representations were false when they made them.

85.  Jungwoo and Yun intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Jungwoo/Yun application or extended the line of credit.

86.  After discovering the fraud, MidFirst sent three written notices to Jungwoo and Yun demanding, *inter alia*, repayment of the fraudulently procured loan funds. They have not repaid any portion of the outstanding loan funds. Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

87.  As a result, MidFirst has been damaged, and Jungwoo and Yun's misrepresentations were substantial factors in causing that damage.

### ZEBRA/OH

88.  Zebra/Oh applied for a business line of credit for Zebra in November 2022, and made the following knowing and material misrepresentations to MidFirst:

a.  Oh represented that he had owned and operated Zebra since inception. He had not.  Guillermo D. Jalil, another apparent purveyor of "shelf

companies," incorporated Zebra in Wyoming in 2015, and filed annual reports on behalf of the company in 2016 and 2017. Oh does not appear until August 2018, approximately three years later, at which time Zebra was registered by Oh as a foreign corporation in California. An EIN was issued for this entity on August 30, 2018, more than three years after incorporation. Notably, according to the most recent California Secretary of State filing dated May 22, 2023, Oh is only listed as the registered agent for Zebra, and "Lucy Lee" is identified as the purported CEO, Secretary, and CFO.

b. Oh represented that Zebra was the only business entity that he owned. It was not, by a long shot. Oh appears to have had, at one time or another, interests in at least 30 other companies, including, but not limited to, "Biano Services" (which is also associated with Kim), "Fabien Financial" (a defendant in the DT Los Angeles Lawsuit), "American Delivery, Inc." (also incorporated in Montana, with the same current address as Zebra), "America Sungkyul University," "Amore Rosado, LLC" (incorporated in New Mexico in 2014, not registered in California until 2019, and Oh not an officer until 2022), "Bullhaus Financial Inc.," "Continue Network, Inc." (incorporated in Wyoming in 2017, not registered in California until 2020, and Oh not an officer until 2022), "Crestamar, Inc.," "Integrico USA, Inc." (incorporated in Montana in 2017, not registered in California until 2020, and Oh not an officer until 2022), "Jesus Korea Sungkyul Church in America (CA)," "Korean Presbyterian Church in America," "Nanun Corp," "OC Maestro," "PCUSA Korean Hope Presbyterian Church," "Renyu Inc.," "Revision Trading," "Samsung Worldwide Corporation," "Shepard Mission," "Shunto Trading," "SKJ INT Inc.," "Southwestern America District," "The Hangbokhan Church," "The Happier Church (fka Bethel Presbyterian Church of So. California)," "Todam Corporation," "Two

Wings Mission (fka Yang Chon Church)," and "Win Production Inc."), none of which he disclosed to MidFirst.

c. Oh represented that he had never declared bankruptcy. He had. Oh filed Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the Central District of California in 2005, *see In re Byungik David Oh and Sarah Young Oh*, Case No. 2005-31459.

d. Oh represented that he never had any judgments entered against him or any of his businesses. He had. On March 3, 2021, Umpqua Bank filed an action against Oh and one of his undisclosed other business entities, "Samsung Worldwide Corporation," Orange County Superior Court ("OCSC") Case No. 2021-01187034, and on September 10, 2021, Mountain States Commercial Collections, Inc. filed an action against Oh, OCSC Case No. 2021-01220139. Both actions had been reduced to judgment at the time of the Zebra/Oh application.

e. Oh represented that neither he nor any of his businesses were involved in pending or ongoing legal actions. He was. As noted above, Oh and one of his other undisclosed business entities, "Fabien Financial, Inc.," were defendants alongside "Chura Services" (Kim) and "Norte Direct LLC" (recipient of Terramor funds) in the DT Los Angeles Lawsuit, which was pending at the time of the Zebra/Oh application.

f. Zebra and Oh represented that Zebra was a wholesaler that needed a line of credit to purchase inventory. This was false. Zebra used its MidFirst checking account to transfer funds to and from other Defendants and their related entities, including, but not limited to, Medical Benefits, Jeong, "Woorim Trading Inc." (Jeong), "Moresmas, Inc." (Eom), "Mayqueen Trading Inc." (Yun), "Mijueum Trading Inc." (Yun), Retrievo, "Logistisys, Inc." (Hong), "Biano Services Inc." (Kim), "Artotech Inc." (Lee), Park, "SNK Medspa Supply" (Park), and "Enumero Inc." (Park), and his other

undisclosed business entities, including, but not limited to, "American Delivery," "Samsung Worldwide," "Todam Corporation," "Shunto Trading," and "Amore Rosado."

89.    Zebra and Oh knew their representations were false when they made them.

90.    Zebra and Oh intended that MidFirst rely on the foregoing misrepresentations, and it did reasonably rely on them in approving the application and extending the requested line of credit; had MidFirst known the true facts, it would not have approved the Zebra/Oh application or extended the line of credit.

91.    After discovering the fraud, MidFirst sent three written notices to Zebra and Oh demanding, *inter alia*, repayment of the fraudulently procured loan funds. They have not repaid any portion of the outstanding loan funds. Indeed, they have not even responded, and have ceased making the minimum interest-only monthly payments.

92.    As a result, MidFirst has been damaged, and Zebra and Oh's misrepresentations were substantial factors in causing that damage.

## CONSPIRACY LIABILITY

93.    Each Defendant was aware that the others planned to fraudulently procure loan funds from MidFirst, and each Defendant agreed with and assisted the other Defendants and intended that they all succeed in fraudulently procuring the loan funds from MidFirst, as shown by the following circumstances, among others:

    a. Yeon Yi referred each Defendant to MidFirst;

    b. After the first application (Upgo), Yeon Yi learned that, in evaluating a Business Express Loan application, MidFirst would consider an entity's time in operation and tended to look favorably on businesses in the wholesale industry that held inventory.

    c. Yeon Yi and the other Defendants used this knowledge in the nine applications that followed, making the same strategic, material misrepresentations to induce MidFirst to approve their applications and issue the requested lines of credit, to wit:

      i.   The associated Guarantor Defendant had owned and operated the Borrower Defendant since its inception;

      ii.   The Borrower Defendant was the only business entity owned by the associated Guarantor Defendant; and

      iii.   The Borrower Defendant was in the wholesale industry and needed a business line of credit to purchase inventory.

    d.  Yeon Yi was intimately involved in each of the ten applications at issue, serving as the point-person for all the other Defendants during their respective applications, and managing the flow of information to and from MidFirst.

94.    After fraudulently procuring the MidFirst loan funds, the Borrower Defendants and Guarantor Defendants shared the spoils, funneling money among themselves and their related entities, and made the minimum interest-only monthly payments, taking advantage of the favorable terms offered by MidFirst to small businesses pursuant to its Business Express Lending program.

95.    And when MidFirst issued the default notices, Defendants simply ignored them, and stopped making any repayments whatsoever.

96.    Through this collective deceit, Defendants fraudulently procured more than $3,000,000 in loan funds from MidFirst and refused to repay it.  As a result of their conspiracy, each Defendant is liable, jointly and severally, for the entire amount of MidFirst's damages—at least $3,000,000.

### AIDING AND ABETTING LIABILITY

97.    The Defendants all used the same playbook (devised in collaboration with Yeon Yi), *i.e.*, convince MidFirst that the applicant business was a (i) longstanding and established wholesaler, with a (ii) committed, singularly focused owner, who (iii) needed funding to purchase inventory to meet demand.

98.    As is clear from the circumstances (including, but not limited to, the common referral source, near identical fraud scheme, and subsequent sharing of the funds they

procured), each Defendant assisted, encouraged, educated, and otherwise aided and abetted each other Defendant in achieving their fraudulent objective. Without this cooperation, Defendants would not have been able to perpetrate their fraud on MidFirst and, thus, Defendants' mutual assistance was a substantial factor in causing MidFirst's damage. Therefore, each Defendant is liable, jointly and severally, for the entire amount of MidFirst's damages—at least $3,000,000.

## PUNITIVE DAMAGES

99. Small businesses make up more than 99% of all businesses in the United States and are the source of 1.5 million new jobs per year. One of the most common reasons small businesses fail is lack of access to capital; thus, small business lending programs like MidFirst's are critical to the success of the enormous and important small business industry.

100. Fraud makes small business lending more costly and less attractive to banks and, consequently, less available and more difficult to secure for legitimate borrowers.

101. The conduct of Defendants, as set forth above, was intentional, willful, fraudulent, malicious, and exemplifies conscious indifference.

102. This conduct must be deterred. An award of punitive damages, designed to punish Defendants and discourage others from engaging in similar conduct, is warranted.

## SECOND CLAIM—VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1961, et seq.)

### (AGAINST ALL DEFENDANTS)

103. MidFirst incorporates Paragraphs 1 through 102 as though fully set forth herein.

104. Defendants are, and at all relevant times were, all associated for a common purpose: to fraudulently procure loan funds from MidFirst. Therefore, Defendants are, and at all relevant times were, an associated-in-fact "enterprise" as defined by 18 U.S.C. § 1961(4).

105. On at least the ten occasions described herein, Defendants used a "scheme or artifice" to defraud MidFirst, a "financial institution," using "false or fraudulent pretenses,

representations, [and] promises" to obtain "moneys, funds, [and] credits" "owned by, or under the custody or control of" MidFirst. These acts are indictable as "bank fraud" under 18 U.S.C. § 1344 and, therefore, Defendants have engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. §§ 1961(1) and 1961(5), a prohibited activity under 18 U.S.C. § 1962(c).

106. Defendants conspired with each other to commit this pattern of racketeering activity, which conspiracy is itself a prohibited activity under 18 U.S.C. § 1962(d).

107. Defendants' enterprise and pattern of racketeering activity affect interstate and foreign commerce, including, but not limited to, because MidFirst's Business Express Lending program serves borrowers across the country, Defendants sent the funds they fraudulently procured across state lines and, in some instances, to foreign countries, and Defendants' misrepresentations from California were ultimately used to secure loan funds from MidFirst, headquartered in Oklahoma.

108. Through this pattern of racketeering activity, Defendants procured more than $3,000,000 in loan funds from MidFirst and refused to repay it. Pursuant to 18 U.S.C. § 1964(c), Defendants are liable for triple that amount—$9,000,000—plus MidFirst's reasonable costs and attorneys' fees.

## THIRD CLAIM—NEGLIGENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

109. MidFirst incorporates Paragraphs 1 through 108 as though fully set forth herein.

110. Each Defendant—including Yeon Yi—made the misrepresentations set forth above without any reasonable grounds for believing them to be true.

111. MidFirst reasonably relied on the misrepresentations set forth above to its detriment, *i.e.*, in its issuance of loan funds to each Borrower Defendant, which each Borrower Defendant and Guarantor Defendant have now refused to repay.

112.   As a result, MidFirst has been damaged according to proof at trial, but by at least the following principal amounts, exclusive of accrued interest, as to each pair of associated Borrower Defendant and Guarantor Defendant:

        a.  Upgo and Kim—$392,009.73;

        b.  Retrievo and Hong—$399,311.06;

        c.  Terramor and Choi—$72,309.05;

        d.  Medical Benefits and Jeong—$235,210.83;

        e.  Zodiak and Park—$391,671.50;

        f.  Insuk and Eom—$270,888.24;

        g.  Durustech and Jang—$399,739.51;

        h.  Vitapro and Lee—$341,047.97;

        i.  Jungwoo and Yun—$383,135.07; and

        j.  Zebra and Oh—$185,183.51.

113.   Yeon Yi also communicated the misrepresentations set forth above in connection with each of the ten applications, and is therefore liable for MidFirst's damages, in the aggregate.

114.   The misrepresentations of the Borrower Defendants and Guarantor Defendants, and MidFirst's reliance thereon, as set forth above, were substantial factors in causing MidFirst's damages.

## FOURTH CLAIM—BREACH OF CONTRACT

### (AGAINST BORROWER DEFENDANTS AND GUARANTOR DEFENDANTS)

115.   MidFirst incorporates Paragraphs 1 through 114 as though fully set forth herein.

116.   To secure their respective lines of credit, each Borrower Defendant executed a promissory note and commercial security agreement, and each Guarantor Defendant executed a commercial guaranty agreement.  These respective written instruments are, in all material respects, identical among the parties, and contain the following pertinent terms:

### THE PROMISSORY NOTE

117.   The promissory note identifies the following as "events of default," among others:

    a.   "Payment Default.  Borrower fails to make any payment when due under this Note."

    b.   "Other Defaults.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower."

    c.   "Default in Favor of Third Parties.  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents."

    d.   "False Statements.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter."

    e.   "Events Affecting Guarantor.  Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note."

f. "Adverse Change.  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired."

g. "Insecurity.  Lender in good faith believes itself insecure."

118.  Upon an event of default, MidFirst may "declare the entire unpaid principal balance . . . and all accrued unpaid interest immediately due."

### THE COMMERCIAL SECURITY AGREEMENT

119.  The commercial security agreement forbids transactions involving the collateral that is the subject of the agreement: "Transactions Involving Collateral.  Except for inventory sold or accounts collected in the ordinary course of Grantor's [Borrower Defendant's] business, or as otherwise provided for in this Agreement, Grantor shall not sell, or otherwise transfer or dispose of the Collateral [as defined in the agreements] . . . Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.  This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender."

120.  The commercial security agreement identifies the same or substantially similar "events of default" as the promissory note:

a. "Payment Default.  Grantor fails to make any payment when due under the Indebtedness."

b. "Other Defaults.  Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or

in any of the Related Documents[9] or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor."

c.  "Default in Favor of Third Parties.  Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents."

d.  "False Statements.  Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter."

e.  "Events Affecting Guarantor.  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness."

f.  "Adverse Change.  A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired."

g.  "Insecurity.  Lender in good faith believes itself insecure."

121.  Upon an event of default, MidFirst may, *inter alia*:

a.  "Accelerate Indebtedness.  Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to

---

[9] "Related Documents" includes, *inter alia*, "promissory notes," "guaranties," and "all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

pay, immediately due and payable, without notice of any kind to Grantor."

b. "Assemble Collateral.  Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral."

c. "Sell the Collateral.  Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor."

d. "Appoint Receiver.  Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the indebtedness."

e. "Collect Revenues, Apply Accounts.  Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral."

f. "Obtain Deficiency.  If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement."

g. "Other Rights and Remedies.  Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time.  In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise."

122.   MidFirst's rights after default are "cumulative and may be exercised singularly or concurrently;" "[e]lection by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies."

### THE COMMERCIAL GUARANTY

123.   Each Guarantor Defendant "absolutely and unconditionally" guarantied his/her associated Borrower Defendant's obligations under the promissory note and commercial security agreement: "CONTINUING GUARANTY OF PAYMENT AND PERFORMANCE.   For good and valuable consideration, Guarantor absolutely and unconditionally guaranties full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness."

124.   The commercial guaranty agreement also contains a representation and warranty that "no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened."

### DEFENDANTS' BREACHES

125.   Each Borrower Defendant and Guarantor Defendant has breached his/her/its contract with MidFirst, to wit:

### UPGO/KIM

126.   Attached hereto as Exhibits 1 through 3 are the promissory note and commercial security agreement executed by Kim on behalf of Upgo, and the commercial guaranty agreement executed by Kim in her individual capacity.

127. MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused. All conditions precedent have occurred.

128. The following acts and omissions by Upgo/Kim constitute "events of default" under the promissory note and commercial security agreement:

      a. Kim's misrepresentations in the course of her application for Upgo, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

      b. The third-party lawsuits filed against Kim and her other undisclosed businesses (*see* n.6, *supra*) trigger the "Default in Favor of Third Parties," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement. In addition, on May 8, 2023, California recorded a Notice of State Tax Lien against Upgo, in the amount of $29,477.87, evidencing another "Default in Favor of Third Parties" and "Adverse Change" under both the promissory note and the commercial security agreement, and the allowance of a "lien" in violation of the "Transactions Involving Collateral" provision of the commercial security agreement, which triggers the "Other Defaults" default under the promissory note and commercial security agreement.

      c. Upgo and Kim ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Insecurity" default under both the promissory note and the commercial security agreement.

129. As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

130.   Upgo has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Upgo has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

131.   Kim has failed and refused to repay the accelerated amount due or otherwise perform any of Upgo's obligations under the promissory note or the commercial security agreement, a fundamental breach of her obligations under the commercial guaranty agreement.

132.   Kim and Upgo have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $392,009.73.

### RETRIEVO/HONG

133.   Attached hereto as Exhibits 4 through 6 are the promissory note and commercial security agreement executed by Hong on behalf of Retrievo, and the commercial guaranty agreement executed by Hong in his individual capacity.

134.   MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.  All conditions precedent have occurred.

135.   The following acts and omissions by Retrievo/Hong constitute "events of default" under the promissory note and commercial security agreement:

    a.   Hong's misrepresentations in the course of his application for Retrievo, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

    b.   Retrievo and Hong ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse

Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

136.  As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

137.  Retrievo has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Retrievo has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

138.  Hong has failed and refused to repay the accelerated amount due or otherwise perform any of Retrievo's obligations under the promissory note or the commercial security agreement, a fundamental breach of his obligations under the commercial guaranty agreement.

139.  Retrievo and Hong have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $399,311.06.

### TERRAMOR/CHOI

140.  Attached hereto as Exhibits 7 through 9 are the promissory note and commercial security agreement executed by Choi on behalf of Terramor, and the commercial guaranty agreement executed by Choi in his individual capacity.

141.  MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.  All conditions precedent have occurred.

142.  The following acts and omissions by Terramor/Choi constitute "events of default" under the promissory note and commercial security agreement:

    a.  Choi's misrepresentations in the course of his application for Terramor, summarized above, constitute "False Statements" under both the

promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

b. After the Terramor application, on March 23, 2023, "The Business Backer, LLC" sued Terramor and Choi in Montgomery County, Ohio, in a lawsuit titled *The Business Backer, LLC v. Terramor Enterprises, Inc. and Byung Choi*, Case No. 2023-CV-01488 (the "Business Backer Lawsuit"), triggering the "Default in Favor of Third Parties," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement.

c. According to the complaint in the "Business Backer Lawsuit," Terramor and Choi entered into an agreement on June 14, 2022, less than three months after the MidFirst application, pursuant to which they sold Terramor's future receivables, an act that is expressly prohibited by the "Transactions Involving Collateral" provision of the commercial security agreement, and triggering the "Other Defaults," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement.

d. In addition, according to the complaint in the "Business Backer Lawsuit," Terramor received $150,000 as sale proceeds for the future receivables and failed to remit those funds to MidFirst, another clear breach of the "Transactions Involving Collateral" provision of the commercial security agreement, and also triggering the "Other Defaults," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement.

e. Terramor and Choi ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

143.   As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

144.   Terramor has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Terramor has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

145.   Choi has failed and refused to repay the accelerated amount due or otherwise perform any of Terramor's obligations under the promissory note or the commercial security agreement, a fundamental breach of his obligations under the commercial guaranty agreement.

146.   Terramor and Choi have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $72,309.05.

### MEDICAL BENEFITS/JEONG

147.   Attached hereto as Exhibits 10 through 12 are the promissory note and commercial security agreement executed by Jeong on behalf of Medical Benefits, and the commercial guaranty agreement executed by Jeong in his individual capacity.

148.   MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.  All conditions precedent have occurred.

149.   The following acts and omissions by Medical Benefits/Jeong constitute "events of default" under the promissory note and commercial security agreement:

> a.   Jeong's misrepresentations in the course of his application for Medical Benefits, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

b. Medical Benefits' failure to make the monthly note payment when due on May 12, 2023, constitutes a "Payment Default."

c. Medical Benefits and Jeong ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

150. As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

151. Medical Benefits has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement. Indeed, Medical Benefits has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

152. Jeong has failed and refused to repay the accelerated amount due or otherwise perform any of Medical Benefit's obligations under the promissory note or the commercial security agreement, a fundamental breach of his obligations under the commercial guaranty agreement.

153. Medical Benefits and Jeong have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst. As a result of the foregoing breaches, MidFirst has sustained damages of more than $235,210.83.

### ZODIAK/PARK

154. Attached hereto as Exhibits 13 through 15 are the promissory note and commercial security agreement executed by Park on behalf of Zodiak, and the commercial guaranty agreement executed by Park in her individual capacity.

155. MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused. All conditions precedent have occurred.

156. The following acts and omissions by Zodiak/Park constitute "events of default" under the promissory note and commercial security agreement:

      a. Park's misrepresentations in the course of her application for Zodiak, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

      b. Zodiak and Park ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

157. As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

158. Zodiak has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement. Indeed, Zodiak has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

159. Park has failed and refused to repay the accelerated amount due or otherwise perform any of Zodiak's obligations under the promissory note or the commercial security agreement, a fundamental breach of her obligations under the commercial guaranty agreement.

160. Zodiak and Park have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst. As a result of the foregoing breaches, MidFirst has sustained damages of more than $391,671.50.

### INSUK/EOM

161.  Attached hereto as Exhibits 16 through 18 are the promissory note and commercial security agreement executed by Eom on behalf of Insuk, and the commercial guaranty agreement executed by Eom in his individual capacity.

162.  MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.  All conditions precedent have occurred.

163.  The following acts and omissions by Insuk/Eom constitute "events of default" under the promissory note and commercial security agreement:

      a.  Eom's misrepresentations in the course of his application for Insuk, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

      b.  On April 10, 2023, Eom and one of his undisclosed entities, "USA Republic, Inc.," were sued for defaulting on a different loan obligation, in *Jonathan Neil & Associates, Inc. v. USA Republic Inc. and Tae Myung Eom*, LASC Case No. 23STCV07761, triggering the "Default in Favor of Third Parties," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement.

      c.  Insuk and Eom ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

164.  As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

165.  Insuk has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Insuk has

stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

166. Eom has failed and refused to repay the accelerated amount due or otherwise perform any of Insuk's obligations under the promissory note or the commercial security agreement, a fundamental breach of his obligations under the commercial guaranty agreement.

167. Insuk and Eom have collectively and separately failed and refused, and continue to fail and refuse, to the pay the total amount of the indebtedness due and owing to MidFirst. As a result of the foregoing breaches, MidFirst has sustained damages of more than $270,888.24.

### DURUSTECH/JANG

168. Attached hereto as Exhibits 19 through 21 are the promissory note and commercial security agreement executed by Jang on behalf of Durustech, and the commercial guaranty agreement executed by Jang in his individual capacity.

169. MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.

170. The following acts and omissions by Durustech/Jang constitute "events of default" under the promissory note and commercial security agreement:

    a. Jang's misrepresentations in the course of his application for Durustech, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

    b. Durustech failed to make the monthly note payment when due on May 15, 2023, constituting a payment default.

    c. Durustech and Jang ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse

Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

171.   As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

172.   Durustech has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Durustech has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

173.   Jang has failed and refused to repay the accelerated amount due or otherwise perform any of Durustech's obligations under the promissory note or the commercial security agreement, a fundamental breach of his obligations under the commercial guaranty agreement.

174.   Durustech and Jang have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $399,739.51.

### VITAPRO/LEE

175.   Attached hereto as Exhibits 22 through 24 are the promissory note and commercial security agreement executed by Lee on behalf of Vitapro, and the commercial guaranty agreement executed by Lee in her individual capacity.

176.   MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.  All conditions precedent have occurred.

177.   The following acts and omissions by Vitapro/Lee constitute "events of default" under the promissory note and commercial security agreement:

   a. Lee's misrepresentations in the course of her application for Vitapro, summarized above, constitute "False Statements" under both the

promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

b. On December 9, 2022, less than three months after Vitapro's application, U.S. Bank recorded a UCC financing statement on all business assets of Vitapro, evidencing Vitapro's encumbrance of the Collateral, an act that is expressly prohibited by the "Transactions Involving Collateral" provision of the commercial security agreement, and triggering the "Other Defaults," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement.

c. Vitapro and Lee ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

178.    As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

179.    Vitapro has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Vitapro has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

180.    Lee has failed and refused to repay the accelerated amount due or otherwise perform any of Vitapro's obligations under the promissory note or the commercial security agreement, a fundamental breach of her obligations under the commercial guaranty agreement.

181.    Vitapro and Lee have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $341,047.97.

### JUNGWOO/YUN

182.    Attached hereto as Exhibits 25 through 27 are the promissory note and commercial security agreement executed by Yun on behalf of Jungwoo, and the commercial guaranty agreement executed by Yun in her individual capacity.

183.    MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.    All conditions precedent have occurred.

184.    The following acts and omissions by Jungwoo/Yun constitute "events of default" under the promissory note and commercial security agreement:

a.    Yun's misrepresentations in the course of her application for Jungwoo, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

b.    Jungwoo and Yun ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Adverse Change" default and "Insecurity" default under both the promissory note and the commercial security agreement.

185.    As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

186.    Jungwoo has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Jungwoo has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

187.    Yun has failed and refused to repay the accelerated amount due or otherwise perform any of Jungwoo's obligations under the promissory note or the commercial security agreement, a fundamental breach of her obligations under the commercial guaranty agreement.

COMPLAINT

188.   Jungwoo and Yun have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $383,135.07.

**ZEBRA/OH**

189.   Attached hereto as Exhibits 28 through 30 are the promissory note and commercial security agreement executed by Oh on behalf of Zebra, and the commercial guaranty agreement executed by Oh in his individual capacity.  All conditions precedent have occurred.

190.   MidFirst has performed all its obligations, if any, required under the promissory note, commercial security agreement, and commercial guaranty agreement, other than those that have been excused.

191.   The following acts and omissions by Zebra/Oh constitute "events of default" under the promissory note and commercial security agreement:

    a.  Oh's misrepresentations in the course of his application for Zebra, summarized above, constitute "False Statements" under both the promissory note and the commercial security agreement, and also trigger the "Adverse Change" default and "Insecurity" default.

    b.  The third-party lawsuits filed against Oh and his other undisclosed businesses trigger the "Default in Favor of Third Parties," "Adverse Change," and "Insecurity" defaults under both the promissory note and the commercial security agreement.

    c.  Zebra and Oh ignored all three of MidFirst's default notices which, alone and in combination with the above defaults, triggers the "Insecurity" default under both the promissory note and the commercial security agreement.

192.  As a result of the foregoing defaults, MidFirst declared the entire unpaid principal balance and all accrued unpaid interest immediately due, pursuant to both the promissory note and the commercial security agreement.

193.  Zebra has not repaid the accelerated amount due or any portion thereof, breaching the promissory note and the commercial security agreement.  Indeed, Zebra has stopped making monthly payments altogether, a "Payment Default" under both the promissory note and the commercial security agreement.

194.  Oh has failed and refused to repay the accelerated amount due or otherwise perform any of Zebra's obligations under the promissory note or the commercial security agreement, a fundamental breach of his obligations under the commercial guaranty agreement.

195.  Zebra and Oh have collectively and separately failed and refused, and continue to fail and refuse, to pay the total amount of the indebtedness due and owing to MidFirst.  As a result of the foregoing breaches, MidFirst has sustained damages of more than $185,183.51.

\*    \*    \*

196.  By their foregoing breaches, the Borrower Defendants and Guarantor Defendants have collectively caused MidFirst more than $3,000,000 in damages.  MidFirst is entitled to recover at least that amount, plus interest and the attorneys' fees and costs incurred in collecting the same, pursuant to the applicable provisions in the promissory notes, commercial security agreements, and commercial guaranty agreements attached hereto.

## FIFTH CLAIM—FORECLOSURE OF COLLATERAL

### (AGAINST BORROWER DEFENDANTS AND GUARANTOR DEFENDANTS)

197.  MidFirst incorporates Paragraphs 1 through 196 as though fully set forth herein.

198.  To secure payment of indebtedness, and for valuable consideration, each Borrower Defendant made, executed, and delivered to MidFirst a commercial security

agreement, as set forth above, granting MidFirst a security interest in the "Collateral" set forth and defined in each said commercial security agreement (collectively, the "Collateral"). The Collateral does not include real property.

199.   MidFirst perfected its security interest in the Collateral by proper filing.

200.   As a result of their foregoing breaches, MidFirst has demanded that the Borrower Defendants surrender the Collateral to MidFirst. The Borrower Defendants have failed and refused to surrender the Collateral to MidFirst. Plaintiff therefore seeks a foreclosure of its security interest in and possession of the Collateral.

## SIXTH CLAIM—TORTIOUS INTERFERENCE WITH CONTRACT

### (AGAINST ALL DEFENDANTS)

201.   MidFirst incorporates Paragraphs 1 through 200 as though fully set forth herein.

202.   As set forth above, each Borrower Defendant and each Guarantor Defendant had a contract with MidFirst, each Defendant knew this, and each Defendant intended to and did induce each other Borrower Defendant and Guarantor Defendant to breach their respective contracts.

203.   This tortious interference has caused MidFirst substantial damage. Each Borrower Defendant and each Guarantor Defendant is liable for its own breach of contract, and each Defendant is liable for inducing the other Borrower Defendants and Guarantor Defendants to breach their contracts, *i.e.*, for the entire amount of MidFirst's damages—at least $3,000,000.

### PUNITIVE DAMAGES

204.   Defendants are guilty of fraud, and an award of punitive damages, designed to punish Defendants and deter others from engaging in similar conduct, is warranted.

## SEVENTH CLAIM—VIOLATION OF CAL. BUS. & PROF. CODE § 17200

### (AGAINST ALL DEFENDANTS)

205.   MidFirst incorporates Paragraphs 1 through 204 as though fully set forth herein.

206.    Defendants' conduct violates California Business and Professions Code § 17200.

207.    The harm to MidFirst outweighs any utility (there is none) of Defendants' conduct.

208.    Defendants' conduct as described herein constitutes unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200.

209.    MidFirst is entitled to an order of restitution of all the ill-gotten gains that Defendants have obtained, in an amount to be proven at trial, but at least $3,000,000.

## **PRAYER FOR RELIEF**

MidFirst requests judgment as follows:

1.    On the First Claim:

   a.    General and special damages according to proof at trial, but at least $3,000,000, against each Defendant, jointly and severally; and

   b.    Punitive damages.

2.    On the Second Claim:

   a.    Treble damages according to proof at trial, but at least $9,000,000, against each Defendant, jointly and severally;

   b.    Attorneys' fees; and

   c.    Punitive damages.

3.    On the Third Claim: Damages according to proof at trial, but at least $3,000,000 as to Yeon Yi, and at least the following amounts jointly and severally as to each pair of associated Borrower Defendant and Guarantor Defendant, as follows:

   a.    Upgo and Kim—$392,009.73;

   b.    Retrievo and Hong—$399,311.06;

   c.    Terramor and Choi—$72,309.05;

   d.    Medical Benefits and Jeong—$235,210.83;

   e.    Zodiak and Park—$391,671.50;

f.  Insuk and Eom—$270,888.24;

g.  Durustech and Jang—$399,739.51;

h.  Vitapro and Lee—$341,047.97;

i.  Jungwoo and Yun—$383,135.07; and

j.  Zebra and Oh—$185,183.51.

4.    On the Fourth Claim:

a.  Damages according to proof at trial, but at least in the following amounts, jointly and severally as to each pair of associated Borrower Defendant and Guarantor Defendant, as follows:

i.  Upgo and Kim—$392,009.73;

ii.  Retrievo and Hong—$399,311.06;

iii.  Terramor and Choi—$72,309.05;

iv.  Medical Benefits and Jeong—$235,210.83;

v.  Zodiak and Park—$391,671.50;

vi.  Insuk and Eom—$270,888.24;

vii.  Durustech and Jang—$399,739.51;

viii.  Vitapro and Lee—$341,047.97;

ix.  Jungwoo and Yun—$383,135.07; and

x.  Zebra and Oh—$185,183.51.

b.  An injunction requiring each Borrower Defendant and Guarantor Defendant to assemble the Collateral and deliver the same to MidFirst, in accordance with the commercial security agreement;

c.  The appointment of a receiver to take possession of said Collateral from each Borrower Defendant and Guarantor Defendant, with all the powers described in the commercial security agreements; and

d.  Attorneys' fees.

5.    On the Fifth Claim: Foreclosure of MidFirst's security interest in and possession of the Collateral.

6.    On the Sixth Claim:

    a.  General and special damages according to proof at trial, but at least $3,000,000, against each Defendant, jointly and severally; and

    b.  Punitive damages.

7.    On the Seventh Claim, restitution according to proof at trial, but at least $3,000,000, against each Defendant, jointly and severally.

8.    On all Claims:

    a.  Costs of suit;

    b.  Prejudgment interest;

    c.  Postjudgment interest; and

    d.  Such further relief as the Court deems just and proper.

DATED: November 20, 2023            Respectfully submitted,

DANIEL M. HAYES
HAYES LITIGATION PC


By:/s/Daniel M. Hayes
   Daniel M. Hayes
   Attorney for Plaintiff MidFirst Bank

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff MidFirst Bank demands a trial by jury of all issues triable of right by jury.

DATED: November 20, 2023             Respectfully submitted,

                                     DANIEL M. HAYES
                                     HAYES LITIGATION PC


                                     By:/s/Daniel M. Hayes
                                         Daniel M. Hayes
                                         Attorney for Plaintiff MidFirst Bank

COMPLAINT